VICTOR G. SISON, Esq. (VS0371)
NJ Bar Number 019931992
Sison Law Offices, P.C.
479 West Side Avenue
Jersey City, NJ 07304
Tel. No. 201-798-8866
Fax No. 201-798-8170
Email:  vgslaw@gmail.com
*Local Counsel for the Plaintiffs*

FELIX Q. VINLUAN, Esq. (FV6788)
NY Bar Number 2880557
Law Office of Felix Vinluan
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
Email:  fqvinluan@yahoo.com
*Pro Hac Vice Counsel for the Plaintiffs*

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

-------------------------------------------------------------x

| | | |
|---|---|---|
| ELENA BAHIAN, CRISTY MAGSICO, | ) | |
| WENNY ROSE MENOR, ROCKIE NERY, | ) | |
| DAISY VILLEGAS and DAMIAN WALLIS, | ) | |
| *Plaintiffs*, | ) | |
| | ) | Docket No. _____ |
| - against - | ) | |
| | ) | COMPLAINT |
| CARE WORLDWIDE INC. and RAINA | ) | |
| MASSEY, | ) | Trial by Jury |
| *Defendants*. | ) | |

-------------------------------------------------------------x

PLAINTIFFS Elena Bahian, Cristy Magsico, Wenny Rose Menor, Rockie Nery, Daisy

Villegas and Damian Wallis, by undersigned counsel, respectfully allege as follows:

### PRELIMINARY STATEMENT

1.      This action arises out of Defendants' recruitment, provision and/or obtaining of

Plaintiffs' labor or services through the abuse and misuse of the immigration sponsorship process

that resulted in the forced labor and/or attempted forced labor of the Plaintiffs by Defendants.

1

2.      Defendants engaged in a pattern or scheme of defrauding Plaintiffs through false representations of H-1B and/or green card sponsorships and used said false representations as basis for requiring Plaintiffs to render labor or services to Defendant company.

3.      After instilling in Plaintiffs the belief that their ability to legalize their stay and work in the United States depended on Defendants' immigration sponsorships, Defendant Massey required or attempted to require Plaintiffs to render services or labor to her company.

4.      Plaintiffs assert claims arising from violations of their rights under the Trafficking Victims Protection Act (18 U.S.C. §1589 and 18 U.S.C. §1590).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because the case involves a federal question, this action arising under the Trafficking Victims Protection Act (TVPA, 18 U.S.C. ¶¶ 1589, 1590).

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the District of New Jersey. Venue is also proper pursuant to 18 U.S.C. §1965.

## PARTIES

7.      Plaintiff Elena Bahian ("Bahian") is a citizen of the Philippines.  She entered the United States lawfully with an H-1B nonimmigrant visa. She presently resides in Union County, New Jersey, within this District.

8.      Plaintiff Cristy Magsico ("Magsico") is a citizen of the Philippines.  She entered the United States lawfully with an R-1 nonimmigrant religious visa. She presently resides in Union County, New Jersey, within this District.

2

9.     Plaintiff Wenny Rose Menor ("Menor") is a citizen of the Philippines.   She entered the United States lawfully with an R-1 nonimmigrant religious visa. She presently resides in Harris County, state of Texas.

10.     Plaintiff Rockie Nery ("Nery") is a citizen of the Philippines.   He entered the United States lawfully with an R-1 nonimmigrant religious visa. He presently resides in Union County, New Jersey, within this District.

11.     Plaintiff Daisy Villegas ("Villegas") is a citizen of the Philippines.   She entered the United States lawfully with an H-1B nonimmigrant visa. She presently resides in the Bronx, state of New York.

12.     Plaintiff Damian Wallis ("Wallis") is a citizen of the Philippines.   He entered the United States lawfully with an R-1 nonimmigrant religious visa. He presently resides in Harris County, state of Texas.

13.     Defendant Raina Massey ("Massey") is, upon information and belief, the President and Chief Executive Officer, and/or director of Defendant Care Worldwide. She is of Indian descent and claims to be both a medical doctor and a doctor in clinical psychology. Upon information and belief, she presently resides in Nassau County, state of New York.

14.     Defendant Care Worldwide, Inc. ("Care Worldwide") is, upon information and belief, a corporation registered and existing under the laws of the state of New Jersey. During all times relevant, it did business at 24 Commerce Street, Suite 525, Newark, New Jersey 07102, within this District.

15.     Upon information and belief, Defendant Massey owned, managed and supervised Defendant Care Worldwide, which claimed to be a clinical research site management company.

16.     Upon information and belief, Defendant Massey had power over personnel decisions.

17.     Upon information and belief, Defendant Massey had power over payroll decisions.

18.     Upon information and belief, Defendants had the power to hire and fire employees, establish and pay their wages, set their work schedules and maintain their employment records.

19.     All of the acts alleged in this Complaint were authorized, ordered, and implemented by Defendant Massey and/or her officers, agents, and representatives while actively engaged in the management of Care Worldwide's business.

## STATEMENT OF FACTS

### Defendants' Organizational Structure

20.     Upon information and belief, Defendant Massey formed and incorporated Defendant Care Worldwide to be her instrument in representing to prospective candidates for green card or H-1B sponsorship as the employer or immigration sponsor.

21.     Massey represented to prospective candidates for green card and/or H-1B sponsorship that Care Worldwide had many clinical trial projects in both United States and in India, and that Care Worldwide required the services of clinical/medical research associates to work on these projects.

22.     Upon information and belief, Massey utilized several individuals to penetrate language and business schools catering to nonimmigrant students, as well as religious institutions, where they leaked information about employment opportunities and H-1B or green card sponsorships in and through Care Worldwide.

23.     Massey hired the services of several Filipino and Indian individuals to man her company's Manhattan (New York) and Newark (New Jersey) offices for the purpose of recruiting other non-immigrants, including but not limited to Filipinos, Indians, and Nepalese, to be offered job positions and eventually to be sponsored as H-1B or green card beneficiaries.

**Defendants' Recruitment and Employment Practices**

24.     Upon information and belief, in 2011 and 2012, Massey hired the services of a Filipino individual named Rosa Ramirez ("Ramirez"), to recruit other Filipino individuals allegedly for employment and H-1B or green card sponsorship.

25.     After Ramirez had found recruits, she would present them to Massey, who would interview them and discuss with them the issues of employment and H-1B or green card sponsorship.

26.     After supposedly qualifying a candidate for possible employment and sponsorship, Massey would then require the candidate to shell out and pay what she termed "immigration application fees".

27.     After the recruited candidates had paid Massey some substantial amount as payment for possible employment and immigration sponsorship, Massey would then require the candidates to work for her company, even while she could not show proof of filing of the immigration sponsorship or even while she could not show proof of approval of the allegedly-filed immigration petitions.

**A.     ELENA BAHIAN**

28.     In October 2011, Ramirez recruited Bahian to be sponsored as an H-1B beneficiary and to be employed by Defendants.

29.     In late October 2011, Ramirez brought Bahian to meet Dr. Raina Massey at the latter's Care Worldwide office, which was then located at 1270 Broadway, Suite 710, New York, NY 10001.

30.     Massey interviewed Bahian and reviewed her educational credentials.

31.     After reviewing Bahian's credentials, Massey offered Bahian, in exchange for $7,500, employment at her Care Worldwide office and to extend and transfer Bahian's H-1B status under her company's sponsorship.

32.     Bahian accepted the offer and gave Massey her initial and partial payment of $3,000.

33.     About a week later, Massey required Bahian to deposit the amount of $2,000 to her Citibank account so she could allegedly instruct her immigration lawyers to start the H-1B transfer petition.

34.     Bahian inquired if she could still secure the approval of her H-1B transfer petition as her H-1B status had just expired. Massey replied that she had very competent immigration lawyers. She assured Bahian that she allegedly had a six-month grace period to file the H-1B transfer petition after her H-1B status had expired.

35.     Relying on Massey's assurances, Bahian made a deposit of $2,000 to Massey's Citibank account so that her H-1B transfer petition could be filed.

36.     After a few months, Bahian inquired from Massey if her H-1B transfer petition had already been filed and when she could start work. Massey replied that her immigration lawyer was causing delay in the filing, and that as soon as the H-1B petition was approved, Bahian could allegedly start working.

37.     In 2012, Massey moved her Care Worldwide office to 24 Commerce Street, in Newark, New Jersey.

38.     On May 11, 2012, Bahian, together with the recruiter Ramirez, went to Massey's New Jersey office and inquired about developments of her H-1B transfer petition.

39.     Massey replied that she had not yet received the notice of receipt that would acknowledge filing with the Immigration Service from her immigration lawyer. She started to talk Bahian into agreeing to be sponsored as an immigrant worker.

40.     Bahian responded that she was interested only at that time about her H-1B transfer sponsorship and the start of her H-1B employment.

41.     Massey told Bahian that there was a possibility of the H-1B transfer petition getting denied, especially as Bahian's H-1B status had expired, and that the only way to legalize her stay in the United States would be through the green card process.

42.     Having been informed about the possibility of her H-1B petition getting denied, Bahian reluctantly agreed to be sponsored by Massey's Care Worldwide Inc. as an immigrant worker.

43.     Massey told Bahian that her company would sponsor Bahian's green card and would offer her the position of a Research Scientist, as Bahian was an educator.

44.     During this meeting, Massey demanded that Bahian make additional payment to her. Bahian gave her $1,500 in cash.

45.     After Bahian made a partial payment, Massey advised her to start looking for a local newspaper to advertise the offered job position. It was allegedly required by the green card or labor certification process.

46.     While looking for a local newspaper, Bahian came to learn that a couple of her church-mates named Jose Nidua and Rockie Nery had likewise been offered green card sponsorship by Massey and were likewise looking for a local newspaper to advertise their job offers.

47.     Bahian recommended to Massey to use "Mabuhay News" as the local newspaper where to advertise her offered job position.

48.     Sometime late May or early June 2012, Bahian read and saw a copy of the Mabuhay News advertisement for the position of Research Scientist.

49.     Thereafter, Massey called up Bahian and demanded that Bahian make more payments to her in exchange for the green card sponsorship. Bahian paid Massey an additional $1,000, making her total payments to $7,500.

50.     At that time, Massey also talked to Bahian about starting the job at her Newark office. Massey told Bahian that if the latter really wanted the green card sponsorship to proceed further, she should immediately start working by making phone calls to some prospective researchers about the nature and responsibilities of their jobs and by doing researches for her "education" responsibilities.

51.     In the last week of June 2012, due to Massey's insistence for Bahian to start working, and fearing that Massey would not proceed with her green card sponsorship, Bahian reported to work at Massey's Newark office.

52.     A church-mate of Bahian, by the name of Rockie Nery, was likewise required by Massey to start reporting on the same day.

53.     Bahian and Nery worked half-days for three consecutive days in the last week of June 2012. Massey required them to do clerical work, calling prospective candidates, filing

documents, and making them do researches, specifically on pharmaceutical and medical literatures.

54.     On her third day of work, Bahian asked Massey for proof of the H-1B filing in her behalf, or even of the H-1B withdrawal, if Massey had it already withdrawn.

55.     Massey could not provide proof of the H-1B filing or of the withdrawal.

56.     Upon Massey's failure to provide proof of the H-1B filing or withdrawal, Bahian insisted to Massey that she would only come back to resume work for Defendants after Care Worldwide's H-1B petition or green card application in her behalf was approved.

57.     Massey did not pay Bahian any wages for the three half-days that she required Bahian to report and work at her Newark office.

**B.     CRISTY MAGSICO**

58.     Sometime in May 2012, Magsico was introduced to Massey's recruiter, Rosa Ramirez, who convinced her to work for and be sponsored by Massey's company.

59.     On June 14, 2012, upon Ramirez's instructions, Magsico, together with her church-mate, Elena Bahian, went to Massey's Newark office.

60.     Massey interviewed Magsico and advised her to submit her educational credentials. She told Magsico that Care Worldwide would sponsor her for a green card position and would employ her.

61.     Although she did not tell Magsico what job position she was going to offer her, Massey told Magsico that Magsico would have to pay her fifteen thousand dollars ($15,000) for the green card sponsorship.

62.     Magsico informed Massey that she had previously filed a green card application which was denied.

63.     Massey responded by saying: "No problem.  We can still file your green card. My immigration lawyers will be able to fix your immigration problem and you will get your green card".

64.     Magsico brought only one thousand dollars ($1,000) with her that day.  Massey said she would accept the initial $1,000 payment, and that she would instruct her immigration lawyers to start Magsico's green card application after she would have paid at least five thousand five hundred dollars ($5,500).

65.     On June 21, 2012, Magsico went back to Massey's office and submitted her educational credentials. She also gave Massey the amount of four thousand five hundred dollars ($4,500) in cash, to make her total payments $5,500.

66.     On or about June 28, 2012, Magsico sent two thousand dollars ($2,000) to Massey through Elena Bahian, who was already required by Massey to work for her at that time.

67.     In early July 2012, Magsico contacted Ramirez and inquired what position was being offered to her by Massey. Ramirez replied that Massey had not responded to her query yet.

68.     Sometime middle of October 2012, Magsico went to Massey's Newark office because Ramirez had told her that she was allegedly advised by Massey to tell Magsico to go to Massey's office so that Magsico could get her immigration packet.

69.     During this meeting, Massey made Magsico pay her another $500 as part of the green card sponsorship fees.

70.     Massey confirmed to Magsico that her immigration lawyers had already started her green card sponsorship by putting out newspaper advertisements for the offered job position.

71.     Magsico inquired what the offered job position was, but Massey could not tell her the position as she had not allegedly received copies of the documentation yet from her

immigration lawyers. Massey, however, assured Magsico that the job advertisements had already been placed.

72.     Massey thereafter told Magsico to come back the following week, when she said, she would make certain that she could show Magsico proof of the job advertisements. She also told Magsico that she should start working for her company the following week by making phone calls and doing research regarding pharmaceutical trials.

73.     In fact, Massey wrote Magsico's name on the white board located inside her office, and indicated therein the date when Magsico would start working, that is, on October 29, 2012, a Monday.

74.     Although Magsico told Massey that she knew nothing about pharmaceutical trials, Massey insisted that she would be trained first by her other employees. She also told Magsico that she had already assigned another employee to train her starting on October 29, 2012. Massey said that she needed many clinical researchers for her business.

75.     Magsico replied that she did not know if she could do the job of a clinical researcher as her educational background was not on science or research.

76.     Massey kept on insisting that Magsico would receive training at first, and then would be doing a lot of phone-calling possible recruits in India and coordinating with them the researches that other employees would be providing her.

77.     On October 24, 2012, Magsico received a phone call from Massey reminding her that she had to report to work the following Monday.

78.     Magsico replied that she did not know if she was ever qualified for the job of a clinical researcher.

79.   Massey thereafter reminded Magsico that some of her friends, like Elena Bahian and Rockie Nery, had in fact already got trained and had worked for her already. She said that the work that Magsico was supposed to do was easy, and that she would be initially trained anyway.

80   Magsico asked what position Massey was really offering her and sponsoring her for, and what job she would be doing. Massey immediately answered: "Clinical Researcher".

81.   So, Magsico asked Massey if she really believed she would be qualified as a Clinical Researcher considering her educational background. Massey assured her that her immigration sponsorship would be approved.

82.   Before hanging up the phone, Massey threatened Magsico that if she did not report to work the following Monday, she would instruct her immigration lawyers to just cancel Magsico's green card sponsorship.

83.   To which, Magsico replied; "Do not do that to me, Dr. Massey. I already paid you $8,000. Just give me the immigration packet and show me proof of the job advertisements."

84.   Massey answered: "I will see you then on Monday. If you want your green card, you would come for your training."

85.   However, Hurricane Sandy arrived and struck the New Jersey area during that week-end and the following Monday.

86.   A couple of days after Hurricane Sandy struck, Magsico called up Ramirez, her recruiter, and told her to follow up with Massey so she would give Magsico her immigration packet. Magsico also told Ramirez that even if there was no hurricane, she did not want to report to Massey's office yet, because Massey would just let her do clerical work, and would not pay

her at all, as Massey did to her friends. Magsico also told Ramirez that she would only start working when she received her work permit card or green card.

**C.     WENNY ROSE MENOR and DAMIAN WALLIS**

87.     Sometime in early 2012, Menor received a phone call from Rosa Ramirez who got her phone number from Menor's church-mate.

88.     Ramirez told Menor that she was looking for recruits to work for Massey's Care Worldwide company. She also said that if the recruits needed immigration sponsorship, Care Worldwide would also do the immigration sponsorship.

89.     At the time of Ramirez's phone call, a neighbor and church-mate of Menor named Damian Wallis was at her apartment.

90.     Menor and Wallis asked Ramirez what job positions she was looking for. They also told her that both were on R-1 status.

91.     Ramirez replied that both Menor and Wallis would have to be interviewed first by Massey herself, and that both had to show Massey their respective educational credentials.

92.     Ramirez told Menor and Wallis that there were various open positions at Massey's company. Massey would allegedly tell them what positions would be available to them after she had reviewed their credentials and after she had interviewed them.

93.     Ramirez told Menor and Wallis that Massey's company was located in Newark, New Jersey.

94.     Desirous to know more about the employment opportunity and the immigration sponsorship, both Menor and Wallis drove from Texas to New Jersey on April 15, 2012, and met up with their common friend, Rockie Nery, to go to Massey's office.

95.     Together with other church-mates, Menor, Wallis and Nery met with Massey on April 17, 2012 at Massey's Newark office.

96.     Massey interviewed each of them, and she asked for copies of their passports, social security cards, transcripts of records and diplomas.

**(1) <u>Wenny Rose Menor</u>**

97.     After reviewing Menor's educational credentials, Massey told Menor and her husband that her company would be able to assist them secure their green cards and that Menor could also work at her office as one of her administrative staff.

98.     Massey told Menor and her husband that in exchange for the green card sponsorship and the offer of employment, Menor would have to pay her $15,000 as immigration sponsorship fees and employment recruitment fees.

99.     Really wanting to be sponsored for a green card and to be employed, Menor borrowed money from Wallis who lent her $7,500 in cash, and which money Menor's husband handed over to Massey as their partial sponsorship and recruitment fees.

100.    After acknowledging receipt of the partial payment, Massey informed Menor that she would be calling her up every now and then for updates about her sponsorship.  She also told Menor and her husband that Menor would immediately start working in her office as soon as the green card papers were approved or when Menor received her work permit card.

101.    Sometime second week of October 2012, Menor received a text message from Massey who informed her that she needed an additional $500 from Menor for her green card sponsorship to move forward.

102.    Massey gave Menor her Chase account number and instructed her to deposit $500 in her account.

103.    Massey also told Menor that as soon as the green card sponsorship moved forward, she would schedule Menor to come back to New Jersey to start her training and employment.

104.    Menor inquired when she would start work, and Massey replied that as soon as she received the money, she would instruct her immigration lawyers to proceed with the green card process. Massey also told Menor that she would probably start work sometime in November, or maybe early December.

105.    Massey also told Menor that she had already started the training program for her other beneficiaries, and mentioned some of Menor's church-mates who had already worked for her, and still others who had already been scheduled to start working. Massey said that she would schedule Menor and Wallis too after her immigration lawyers would give her the go-signal. She promised though that the start-date would certainly be before the end of the year.

106.    After their phone conversation, Menor received a text message from Massey that if Menor did not send the $500, her immigration case would allegedly be discontinued.

107.    After receiving the text message, Menor called up Rockie Nery and tried to confirm if Massey had been collecting more money from her other green card beneficiaries.

108.    Nery confirmed to Menor that he had heard from their church-mates who were also green card beneficiaries of Massey's company that if Massey did not receive additional $500 from each of them, their respective green card applications would allegedly not move forward.

109.    So, on October 18, 2012, Menor requested her husband to deposit additional $500 to Massey's Chase account.

   **(2) Damian Wallis**

110.   During the meeting with Massey, Wallis inquired if he could still be sponsored considering that his R-1 status had already expired.

111.   Massey replied that she could still sponsor Wallis, and that his R-1 expiration would not be a problem. She said that her immigration lawyers knew how to fix Wallis's immigration problem.

112.   Wallis also asked Massey if she could sponsor his wife, who was still in the Philippines.

113.   Massey replied "yes", and told Wallis that for any H-1B sponsorship, the beneficiary would have to pay her company seven thousand five hundred dollars ($7,500.00). She also told Wallis and the rest of his group that if anybody of them wanted to be sponsored for a green card, the cost for the green card sponsorship would be fifteen thousand dollars ($15,000.00).

114.   Wallis inquired what position Massey would be able to offer him if he were to be sponsored. Massey replied that because Wallis had a bachelor's degree, it would not be difficult to offer him an H-1B position, but that she would leave it to her lawyers to decide what position to offer him, after Wallis would have really decided to be sponsored by her company.

115.   Wallis told Massey that he would have to think more about his options, and that he still needed to raise more money to be able to pay Massey the expected costs she had mentioned.

116.   On June 12, 2012, after having discussed the matter with his wife, Wallis flew to New Jersey to meet again with Dr. Massey.

117.   This time, Wallis told Massey that he wanted her company to sponsor his wife as an H-1B employee.  Massey replied that she would invite first Wallis's wife as a visitor on the

pretext that his wife would be conducting with her some sort of a workshop on drug abuse counseling.  Wallis's wife worked for her church and was very active dealing in youth activities in the Philippines.  Massey told Wallis that after his wife should have come to the United States on a tourist or visitor visa, then that would be the time when Massey would file for Wallis's wife's H-1B sponsorship.

118.    Massey likewise reminded Wallis that he had to pay her the costs for the H-1B sponsorship.  Thereupon, Wallis told her that he had only brought five thousand five hundred dollars ($5,500) with him.

119.    Massey said that she would take whatever amount of money Wallis had brought with him at that time.

120.    On or about October 16, 2012, Wallis received word from his friend, Rockie Nery, that the H-1B petition filed by Massey's Care Worldwide on Nery's behalf had already been approved.

121.    Having learned of Nery's H-1B approval, Wallis decided to fly again to New Jersey, with the thought that Dr. Massey should instead prioritize his H-1B sponsorship, instead of his wife's.

122.    On or about the third week of October 2012, Wallis met with Massey again and inquired if her company could instead prioritize his H-1B sponsorship.

123.    Upon hearing Wallis's request, Massey got excited and congratulated Wallis for making that decision as she allegedly needed more employees in her business at that time. She said that the H-1B petition was faster than waiting for a green card.

124.    Massey reassured Wallis that he would soon start working for her company no later than the end of the year, and that he did not have to worry about his immigration status, as her excellent lawyers would allegedly fix his immigration status.

125.    Massey agreed that she would use the money Wallis previously gave her, which was $5,500, but that she would have to deduct $1,500 from it to pay her immigration lawyers. Thus, she only credited Wallis with $4,000.  She also told Wallis that he had to pay her the total amount of $7,500 for his H-1B sponsorship.

126.    So, Wallis paid Massey the remainder of $3,500, thereby making his full payment of $7,500 for the H-1B sponsorship.

127.    On November 14, 2012, Wallis texted Massey: "Did you submit H-1B?".

128.    Massey texted back and replied:  "Yes, Damian".

129.    Upon reading Massey's text message, Wallis immediately called up Massey and inquired if she could provide him with proof of filing. Massey replied that the documentation was still with her lawyers.

130.    During this conversation, Massey told Wallis to prepare to relocate to New Jersey as she was planning on scheduling him to start work at her Newark office no later than end of the year, or at the beginning of the following year, at the very latest.

131.    Massey advised Wallis that some of Wallis's church-mates whom she had allegedly sponsored had already started working for her company. Massey told Wallis to call her back the following week for the proof of the H-1B filing. She reiterated that Wallis should start relocating to New Jersey so he could start his work soon.

132.    After several days, Wallis called up Massey again to inquire about developments of his H-1B sponsorship.

133.    Wallis never heard from Massey since then.

**D.    ROCKIE NERY**

134.    Sometime in early 2012, Nery was introduced to Massey's recruiter, Rosa Ramirez, who convinced her to work for and be sponsored by Massey's company.

135.    On April 17, 2012, upon Ramirez's instructions, Nery, together with her church-mates, Elena Bahian, Jose Nidua, Damian Wallis and Wenny Menor, went to Massey's Newark office.

136.    Massey interviewed Nery and informed the latter that despite his R-1 status having expired, her immigration lawyers could remedy his immigration situation and that Nery would still be able to secure his green card through her company's sponsorship.

137.    Massey told Nery that in exchange for the immigration sponsorship and the expected employment to work for Care Worldwide, Nery would have to pay her the total amount of fifteen thousand dollars ($15,000.00).

138.    Massey demanded that Nery would pay her at least one-half or seven thousand five hundred dollars ($7,500) to start the green card process.

139.    Nery informed Massey that he would have to think it over first if he would like to be sponsored by Massey's company as a green card holder.

140.    On April 26, 2012, Nery went back to Massey's Newark office, together with other church-mates who were also promised H-1B and/or green card sponsorship by Dr. Massey.

141.    During this meeting, Nery told Massey that he had decided to be sponsored by Massey's company. He gave Massey five thousand dollars ($5,000.00) as initial payment for the green card sponsorship.

142.    After several follow-up calls during the next few weeks, Massey told Nery and other prospective beneficiaries, that they had to start the job posting for their labor certification applications.

143.    Massey also told Nery that if he wanted to start employment and to secure his immigration papers sooner, he should agree to be sponsored as an H-1B employee. Massey told Nery that he would have to pay an additional $2,000 for the H-1B sponsorship.

144.    Upon information and belief, one beneficiary recommended Mabuhay News for advertisement purposes, and it was the same newspaper that Massey recommended to Nery.

145.    Sometime before the end of May 2012, Nery paid Massey an additional amount of $2,000 for his H-1B sponsorship.

146.    Sometime also in late May or early June 2012, Nery read and saw a copy of the Mabuhay News advertisement for the position of Research Scientist.

147.    Sometime in late June 2012, Massey told Nery to report to her office so that he could be trained for the H-1B position that was going to be filed in his behalf.

148.    Massey told Nery that if he did not report to work, his H-1B petition would allegedly not be filed.

149.    Fearing that his H-1B petition would not be filed, Nery reported to work at Massey's Newark office in the last week of June 2012.

150.    On the day that Nery reported to work, he saw his church-mate, Bahian, also reporting to work at Massey's office. Nery and Bahian worked half-days for three consecutive days in the last week of June 2012.

151.   Massey required them to do clerical work, calling prospective candidates, filing documents, and making them do researches, specifically on pharmaceutical and medical literatures.

152.   On his third day of work, Nery, together with Bahian, asked Massey for proof of the H-1B filing in his behalf.

153.   Massey could not provide proof of the H-1B filing.

154.   Upon Massey's failure to provide proof of the H-1B filing, Nery insisted to Massey that he would only come back to resume work for Defendants after Care Worldwide's H-1B petition in his behalf was approved.

155.   Massey did not pay Nery any wages for the three half-days that she required Nery to report and work at her Newark office.

156.   Sometime in July 2012, Nery went again with Bahian to Massey's office to follow-up on their H-1B petitions.

157.   During this meeting, Massey gave Nery a photocopy of what purportedly was a USCIS notice acknowledging receipt of Care Worldwide's H-1B petition in his behalf.

158.   The USCIS notice bore case number EAC-12-174-53346.

159.   Massey told Nery that once the H-1B petition got approved, Nery should work for Care Worldwide immediately.

160.   On October 16, 2012, Nery checked the online status report of his H-1B petition, and he found out that the H-1B petition filed on his behalf had been approved.  So, he immediately called up Massey and told her about the good news.  She told him to wait for the approval notice to arrive at her immigration lawyer's office.

161.    On October 25, 2012, Nery called Massey and informed her that he needed the approval notice of his H-1B petition so he could apply for his driver's license.

162.    Massey told Nery to pick up the approval notice the following day, and to also bring along Nery's friend, Roderick Natoc ("Natoc"), whom Nery had previously recommended to Massey also for employment and sponsorship.

163.    In the afternoon of October 26, 2012, Nery brought his friend, Natoc, with him to Massey's office.

164.    Massey advised Nery that the H-1B approval notice was still with her immigration lawyers, but that Nery should come back the next Monday (October 29, 2012) to pick up the approval notice and to sign his employment agreement.

165.    Massey told Nery that he should start working for her company as soon as he signed the employment contract and after he should have paid the remainder of his immigration sponsorship and employment recruitment fees.

166.    Unfortunately, Hurricane Sandy struck on that following Monday.

167.    Nery was not able to go back to Massey's office to pick up the H-1B approval notice and to sign the employment contract.

168.    In the aftermath of the hurricane, Massey sent a text message to Nery that her Newark office remained closed due to effects from Hurricane Sandy.

169.    A couple of weeks later, Nery scheduled with Massey to pick up the H-1B approval notice and to sign the employment contract.

170.    Massey reminded Nery to prepare the full payment of his immigration sponsorship and to get ready to report to work.

171.     The scheduled meeting to pick up the H-1B approval notice and to start employment did not materialize as Massey failed to show up.

**E.     DAISY VILLEGAS**

172.     On February 6, 2012, Villegas met Rosa Ramirez, Massey's recruiter who had recruited Villegas's friend, Laureen Regis ("Regis").

173.     Ramirez introduced Regis and Villegas to Massey at the Care Worldwide office in Newark, New Jersey.

174.     During the meeting, Massey explained to Regis that she was qualified to be sponsored and to be employed by Care Worldwide as a Clinical Researcher.

175.     Massey told Regis that she would have to pay Massey immigration sponsorship fee of at least $5,000.

176.     Because Villegas was present and was listening during the interview, Massey also spoke to Villegas and she asked Villegas about her educational and employment background.

177.     Having learned of Villegas's immigration and educational background, Massey told Villegas that her company could transfer her H-1B status under its sponsorship and that she could work as her company's Business Analyst. Massey likewise offered Villegas green card sponsorship.

178.     Massey told Villegas that in exchange for the employment and H-1B transfer sponsorship, Villegas would pay Massey the amount of $7,000.

179.     Villegas told Massey that she needed time to consider Massey's offer of H-1B transfer and green card sponsorship.

180.    About two weeks later, Villegas called up Massey and told her that she was accepting Massey's offer of H-1B transfer sponsorship, with green card sponsorship at the end of the H-1B process.

181.    Massey then told Villegas to start paying her sponsorship fee and gave her bank account information which Villegas should send the payments to.

182.    On March 22, 2012, Villegas made a wire transfer to Massey's Citibank account in the amount of $500.

183.    On May 22, 2012, Villegas went to Massey's Newark office and gave her a payment of $1,000 in cash.

184.    On June 21, 2012, Villegas again went to Massey's Newark office and gave her another payment of $1,000 in cash.

185.    On July 26, 2012, Villegas again went to Massey's Newark office and gave her another cash payment of $1,000.

186.    On August 17, 2012, Massey called Villegas up regarding payment of her H-1B sponsorship fee. So, Villegas again went to Massey's office and made another payment of $1,000.

187.    On August 30, 2012, Massey called Villegas up and arranged to meet her at a furniture store in Queens County, New York, where Villegas gave Massey cash payment of $500.

188.    On November 30, 2012, Villegas went to Massey's office and gave her another $500 in cash payment.

189.    On December 28, 2012, Massey scheduled Villegas to meet her again at the Queens furniture store where Villegas made another $500 in cash payment to Massey.

190.     During this meeting, Massey gave Villegas a copy of what purported to be a USCIS notice of receipt acknowledging Care Worldwide's H-1B transfer petition on behalf of Villegas.

191.     Massey reminded Villegas to get ready to start her employment at Care Worldwide. She said it would be very soon.

192.     On January 18, 2013, Massey called up Villegas and demanded that she gave her another payment.   Villegas thereafter wire-transferred the amount of $500 to Massey's new Citibank account.

193.     On February 18, 2013, Massey called Villegas again and demanded that she sent her more money.

194.     At this time, Villegas inquired if Massey had received her H-1B approval notice, and if it was true that Massey had allegedly scammed other immigration beneficiaries by giving them fake USCIS notices of receipt.

195.     Massey replied that she had not yet received Villegas's H-1B approval notice, and that the rumors about fake USCIS documents should be disregarded as not true. Massey reiterated to Villegas that Villegas had seen her Newark office where employees were working, and that most of those employees had their H-1B petitions already approved.

196.     Massey reassured Villegas that she would require Villegas to start her training and employment at her Newark office anytime soon, as Massey allegedly expected the H-1B petition to be approved soon.

197.     In fact, Massey told Villegas that Villegas should prepare for a March 1, 2013 start-date of her employment with Care Worldwide.

### Defendants' Pattern and Practice of Requiring Immigration Beneficiaries to Render Services and of Threatening them with Serious Harm

198.    Upon information and belief, there have been other Filipino nationals recruited and promised immigration sponsorships by Defendants Massey and Care Worldwide.

199.    Upon information and belief, in 2009 and 2010, Defendants recruited and filed nonimmigrant H-1B petitions on behalf of several Filipino Science graduates/teachers whom Massey had promised employment as Clinical/Medical Researchers.

200.    Upon information and belief, Defendants required each of these H-1B beneficiaries to pay at least $3,500 in immigration application fees.

201.    Upon information and belief, while the H-1B petitions were pending or after these H-1B petitions were approved, Defendants required these H-1B beneficiaries to start working for Care Worldwide's office in Manhattan, New York.

202.    Upon information and belief, Defendants did not pay these H-1B beneficiaries their promised wages when they reported to work.

203.    Upon information and belief, when these H-1B beneficiaries complained about Defendants' failure to pay them their wages, Defendants threatened them with the cancellation or revocation of their immigration sponsorships and/or with the loss of their employment.

204.    Upon information and belief, the first group of H-1B beneficiaries that complained against Defendants for violation of the federal law against human trafficking and/or forced labor filed a federal complaint against Defendants before the Southern District Court of New York and which case was captioned "*Tuburan et al. v. Massey et al.*", with Index No. 12-cv-08561(NRB).

205.    Upon information and belief, the Tuburan group of plaintiffs filed the federal complaint on November 26, 2012.

206.    Upon information and belief, another group of immigration beneficiaries that complained against Defendants for violation of the federal law against human trafficking and/or forced labor filed a separate federal complaint against Defendants before the Southern District Court of New York and which case was captioned "*Calumba et al., v. Massey et al.*", with Index No. 13-cv-08936 (NRB).

207.    Upon information and belief, the Calumba group of plaintiffs alleged that they were promised immigration sponsorships; were made to pay immigration sponsorship fees; after their H-1B petitions were approved, were required to pay additional money in terms of withholding taxes; were threatened that if they did not pay the withholding taxes, their H-1B petitions would be withdrawn and they would be deported to their home country, and; were either made to report to work without pay or were made to report at the office with no actual job assignments.

208.    Upon information and belief, in or about late October 2012 to mid-November 2012, Defendants attempted to require each of Plaintiffs Bahian, Magsico, Nery, Menor and Wallis to report to work at Defendants' Newark office.

209.    Upon information and belief, sometime in or about late October 2012, the Tuburan group of plaintiffs had advised Defendants that it was going to file a federal trafficking complaint against them in the Southern District Court of New York.

210.    Upon information and belief, Massey did not implement her plan to have each of Plaintiffs Bahian, Magsico, Nery, Menor and Wallis start reporting to work at her Newark office as she feared this group might also file a similar case against her and Care Worldwide.

211.    Upon information and belief, had the Tuburan group not inform her of its impending federal trafficking complaint, Massey would have actually required each of Plaintiffs

Bahian, Magsico, Nery, Menor and Wallis to start reporting to her office as early as late October 2012 to mid-November 2012.

212.    Upon information and belief, another of Defendants' recruit by the name of Reuben Belandres ("Belandres") was given a fake USCIS notice of receipt by Massey sometime in October 2012, and that this beneficiary (Belandres) submitted said USCIS notice of receipt to the New Jersey Motor Vehicle Commission sometime in December 2012 to secure his driver's license.

213.    Upon information and belief, the New Jersey Motor Vehicle Commission determined that the USCIS notice of receipt presented by Belandres and which came from Defendant Massey was fraudulent.

214.    Upon information and belief, Belandres was apprehended for submitting a fake document and he was imprisoned.

215.    During her February 18, 2013 discussion with Massey, Villegas informed Massey about the case involving Belandres and about the fake USCIS notice of receipt and told Massey about Belandres's imprisonment.

216.    Upon information and belief, Defendants had intended to require Plaintiff Villegas to report to work at Defendants' Newark office starting on March 1, 2013.

217.    Upon information and belief, had Villegas not informed Massey about Belandres's incarceration due to the fake USCIS notice issued by Massey, Massey would have actually required Villegas to start reporting at her Newark office on March 1, 2013.

218.    Based from Massey's statements to each Plaintiff demanding that each would start reporting to work, coupled by Defendants' previous pattern and practice of, including, requiring their immigration beneficiaries to report to work, Defendants had attempted to obtain

each of Plaintiffs' labor or services, had intended not to pay them, and had intended to threaten them with cancellation or revocation of their immigration petitions or with the loss of their employment or with the threat of possible deportation, if each Plaintiff would have refused to render his/her labor or services.

## FIRST CAUSE OF ACTION
### Trafficking Victims Protection Act of 2003 ("TVPA")
### Forced Labor, 18 U.S.C. §§ 1594, 1589

219.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 218 as if set forth fully herein.

220.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act, as amended.

221.    Defendants Care Worldwide and Massey subjected Plaintiffs to forced labor and/or attempted forced labor in violation of 18 U.S.C. §§ 1594 and 1589.

222.    Defendants knowingly obtained or knowingly attempted to obtain Plaintiffs' labor and services by subjecting Plaintiff to threats of serious harm of, including revocation or withdrawal of immigration sponsorship petitions and/or loss of immigration status and/or of being subjected to deportation, in violation of 18 U.S.C. §1589(a)(2).

223.    Defendants knowingly obtained or knowingly attempted to obtain Plaintiffs' labor and services by means of the abuse and/or misuse of the legal immigration sponsorship process, in violation of 18 U.S.C. §1589(a)(3).

224.    Defendants knowingly obtained or knowingly attempted to obtain Plaintiffs' labor and services by using a scheme, plan and pattern intended to cause Plaintiffs to believe that, if they did not work for Defendants, they would suffer the serious harm of revocation or

withdrawal of immigration sponsorship petitions and/or loss of immigration status and/or the serious harm of being subjected to deportation, in violation of 18 U.S.C. §1589(a)(4).

225.   Defendants knowingly benefited, financially, from participation in the venture of providing and/or obtaining the labor or services of Plaintiffs or of attempting to provide and/or obtain the labor or services of Plaintiffs, by means of using a scheme, plan and pattern intended to cause Plaintiffs to believe that, if they did not work for Defendants, they would suffer the serious harm of revocation or withdrawal of immigration sponsorship petitions and/or loss of immigration status and/or the serious harm of being subjected to deportation.

226.   Defendants knowingly benefited, financially, from participation in the venture of providing and/or obtaining the labor or services of Plaintiffs or of attempting to provide and/or obtain the labor or services of Plaintiffs, by means of the abuse and/or misuse of the immigration sponsorship process.

227.   Defendants knowingly benefited, financially, from participation in the venture of providing and/or obtaining the labor or services of Plaintiffs or of attempting to provide and/or obtain the labor or services of Plaintiffs, by means of subjecting Plaintiffs to threats of serious harm of, including revocation or withdrawal of immigration sponsorship petitions and/or loss of immigration status and/or of being subjected to deportation.

228.   As a result of any of the above violations, Plaintiffs suffered damages.

229.   Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

**SECOND CAUSE OF ACTION**
**Trafficking Victims Protection Act of 2003 ("TVPA")**
**Human Trafficking, 18 U.S.C. §1590**

230.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 229 as if set forth fully herein.

231.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act, as amended.

232.    Defendants knowingly recruited, harbored, and transported Plaintiffs for the purpose of subjecting them to forced labor or attempted forced labor in violation of 18 U.S.C. §1590.

233.    Defendants recruited Plaintiffs and caused them to travel or to be transported to various counties in the state of New Jersey, or to travel inter-state, for the purpose of subjecting them to forced labor or attempted forced labor.

234.    As a result of the above violations, Plaintiffs suffered damages.

235.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs demand judgment against Defendants Care Worldwide Inc. and Massey and respectfully requests the following relief:

1.    Compensatory damages, including emotional distress damages, punitive damages, attorneys' fees and costs;

2.    Such other relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on each and every claim set forth herein.

Dated: June 24, 2021. Jersey City, New Jersey.

Yours, etc.,

VICTOR G. SISON, Esq. (VS0371)
NJ Bar Number 019931992
Sison Law Offices, P.C.
479 West Side Avenue
Jersey City, NJ 07304
Tel. No. 201-798-8866
Fax No. 201-798-8170
Email:  vgslaw@gmail.com
*Local Counsel for the Plaintiffs*

FELIX Q.VINLUAN, Esq (FV6788)
NY Bar Number 2880557
Law Office of Felix Vinluan
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
Email:  fqvinluan@yahoo.com
*Pro Hac Vice Counsel for the Plaintiffs*

## **VERIFICATION**

STATE OF ~~TEXAS~~ Washington )
COUNTY OF ~~HARRIS~~ King ) S.S.

WE, WENNY ROSE MENOR and DAMIAN WALLIS, both of legal age and presently

residing in Harris County, state of Texas (although visiting Washington state at the moment),

after having been sworn in accordance with law, hereby state that we are two of the six Plaintiffs

in the within Action/Complaint. Each of us has read the foregoing Complaint and knows the

contents thereof. The contents are true to our respective knowledge, except as to matters therein

stated to be alleged upon information and belief, and as to those matters, each of us believes

them to be true.

_____        _____
WENNY ROSE MENOR                          DAMIAN WALLIS

SUBSCRIBED AND SWORN to before me this 24 day of June 2021 in Seattle,

state of Washington.

Notary Public

_____

**Notary Public**
**State of Washington**
**DAVID NGUYEN**
COMMISSION# 20115632
MY COMMISSION EXPIRES
October 15, 2024

33

## **VERIFICATION**

STATE OF NEW YORK        )
COUNTY OF QUEENS       ) S.S.

WE, ELENA BAHIAN, CRISTY MAGSICO, ROCKIE NERY and DAISY VILLEGAS, all of legal age, the first three of us presently residing in Union County, state of New Jersey, and the fourth, in the Bronx, state of New York, after having been sworn in accordance with law, hereby state that we are the Plaintiffs in the within Action/Complaint.  Each of us has read the foregoing Complaint and knows the contents thereof.  The contents are true to our respective knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, each of us believes them to be true.

_____          _____
ELENA BAHIAN                                      CRISTY MAGSICO

_____          _____
ROCKIE NERY                                        DAISY VILLEGAS

SUBSCRIBED AND SWORN to before me this 24th day of June 2021 in Queens County, state of New York.

Notary Public

DOMINADOR MAPHILINDO O. CARRILLO
Notary Public, State of New York
No. 02CA6414181
Qualified in Queens County
Commission Expires February 16, 2025

34